Name Gordon A. Greenberg (SBN 116774)
McDermott Will & Emery LLP
Address 2049 Century Park East
Suite 3800
City, State, Zip Los Angeles, California 90067
Phone 310.277.4110
Fax 310.277.4730
E-Mail ggreenberg@mwe.com

☐ FPD   ☐ Appointed   ☐ CJA   ☐ Pro Per   ☒ Retained

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

United States of America

v.

Henry Samueli

**PLAINTIFF(S),**

**DEFENDANT(S).**

CASE NUMBER:
SA CR 08-156 CJC

## NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that ___Henry Samueli___ hereby appeals to the
*Name of Appellant*
United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☒ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

**Civil Matter**

☐ Order (specify):

☐ Judgment (specify):

☐ Other (specify):

Imposed or Filed on __September 8, 2008__ . Entered on the docket in this action on __September 8, 2008__ .

A copy of said judgment or order is attached hereto.

__September 22, 2008__
Date

Signature

☐ Appellant/ProSe   ☒ Counsel for Appellant   ☐ Deputy Clerk

Gordon A. Greenberg

**Note:** The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of
the attorneys for each party. Also, if not electronically filed in a criminal case, the Clerk shall be furnished
a sufficient number of copies of the Notice of Appeal to permit prompt compliance with the service requirements
of FRAP 3(d).

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

Case No.   SACR 08-00156-CJC                                    Date   August 26, 2008

Present: The Honorable   CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE

Interpreter   None

| Michelle Urie | Not Reported | Not Present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| Henry Samueli | Not | | X | Gordon A. Greenberg | Not | | X |
| | | | | Hoyt Y. Sze | Not | | X |

Proceedings:   (IN CHAMBERS) ORDER DENYING DEFENDANT DR. HENRY SAMUELI'S UNOPPOSED EX PARTE APPLICATION

The Court, having considered Defendant Dr. Henry Samueli's Unopposed Ex Parte Application for (1) Order Sealing Objections to Presentence Report and Sentencing Recommendation, Declaration of Gordon A. Greenberg, and the Instant Application and Order; (2) Scheduling In Camera Expedited Hearing on Objections for September 2, 2008, and the lack of opposition thereto, HEREBY ORDERS that the Objections to Presentence Report and Sentencing Recommendation, the Declaration of Gordon A. Greenberg, and the Instant Application, shall not be filed but rather returned to Dr. Samueli's counsel, Gordon A. Greenberg.

The Court hereby declines to order an In Camera hearing because the parties have not made sufficient showing to justify that the hearing be held In Camera.

The Court does not see any justification for filings under seal. The allegations of the criminal indictment and SEC complaint are already a matter of public record, and no Rule 6(e) material will be disclosed as the Court will not consider the hearsay statements allegedly made by the Case Agent when it determines whether to accept or reject the parties' plea agreement. In light of the foregoing, counsel for Dr. Samueli is invited to file any objections to the PSR on or before Tuesday, September 2, 2008.

                                                                    :        0

                                        Initials of Deputy Clerk   mu

cc:

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

**SEP - 8 2008**

CENTRAL DISTRICT OF CALIFORNIA
BY_____DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>HENRY SAMUELI,<br><br>Defendant. | Case No.: SACR 08-00156-CJC<br><br>**ORDER REJECTING THE PARTIES' PLEA AGREEMENT** |

On June 23, 2008, Defendant Henry Samueli pleaded guilty to one count of making a false statement to the U.S. Securities and Exchange Commission ("SEC") in violation of 18 U.S.C. § 1001. The plea agreement between Dr. Samueli and the United States Attorney's Office ("USAO") stipulates to a sentence of five years probation and a $250,000 fine, as well as a payment to the U.S. Treasury of $12 million. For entering his guilty plea, the USAO promises Dr. Samueli he will not be prosecuted for his conduct related to stock option granting practices at his former company, Broadcom Corporation ("Broadcom"). The plea agreement, however, does not require Dr. Samueli to cooperate with the USAO's prosecution of other key Broadcom executives, including fellow Broadcom Co-Founder Henry T. Nicholas and

Chief Financial Officer William Ruehle, for their conduct in the same stock option granting practices.

While the USAO and Dr. Samueli have stipulated to what they believe is the appropriate sentence in this case, the Court has an independent obligation to ensure that the stipulated sentence is fair, appropriate, and in the interest of justice. Regrettably, the parties' proposed sentence falls short of this standard. The Government has publicly levied very serious allegations of securities fraud against Dr. Samueli that, if true, warrant a significant prison sentence.[1] The SEC has filed a civil enforcement action against Dr. Samueli, charging him and three others with perpetrating "a massive, five-year scheme that involved fraudulent backdating of dozens of option grants, falsifying corporate records, intentionally false accounting, and lying to shareholders."[2] The grand jury has returned a criminal indictment of Dr. Nicholas and Mr. Ruehle that names Dr. Samueli (referred to as "H.S.") as an unindicted co-conspirator in Defendants Nicholas and Ruehle's scheme to fraudulently conceal $2.2 billion in Broadcom compensation expenses. If there is any truth to these allegations, a probationary sentence does not adequately reflect or account for the seriousness of the underlying misconduct alleged against Dr. Samueli.

The stipulated sentence could also create unacceptable disparities in sentencing between Dr. Samueli and other similarly situated defendants. Dr. Samueli's alleged co-conspirators, Dr. Nicholas and Mr. Ruehle, face life sentences if convicted on all counts. In fact, most defendants guilty of run-of-the-mill crimes of fraud in the Ninth Circuit go to prison, serving an average of seventeen months in custody. Dr. Samueli, who is not even required to cooperate with the Government's investigation, will not

---

[1] References to the "Government" refer to the SEC and the USAO jointly.
[2] Statement of Linda Chatman Thomsen, Director of the SEC's Division of Enforcement, May 14, 2008, at 1, *available at* www.sec.gov/news/press/2008/2008-87.htm.

spend a single day in prison under the agreement.  Again, if there is any truth to the Government's allegations against Dr. Samueli, this disparity is indefensible.

Finally, accepting this plea agreement will erode the public's trust in the fundamental fairness of our justice system.  The public expects the Court to treat all defendants equally, without regard to race, religion, ethnicity, class, or wealth.  The $12 million payment contained in this plea agreement suggests that Dr. Samueli's wealth and popularity will allow him to avoid the consequences of his alleged misconduct at Broadcom.  The Court cannot accept a plea agreement that gives the impression that justice is for sale.

## I.    THE TERMS OF THE PLEA AGREEMENT

Dr. Samueli and the USAO have entered into a binding plea agreement under which Dr. Samueli has pleaded guilty to a single-count information charging him with violating 18 U.S.C. § 1001, making a materially false statement to the SEC.  (Plea Agmt. ¶ 3.)  According to the factual basis underlying the plea, Broadcom authorized two committees to grant stock options to the company's employees: the options committee and the compensation committee.  (Plea Agmt. Ex. B.)  Dr. Samueli, Broadcom's Chief Technical Officer and Co-Chairman of the Board of Directors, was a member of the options committee, which had authority to grant stock options to all Broadcom employees except Section 16 officers.[3]  (Plea Agmt. Ex. B.)  The compensation committee was composed of independent, non-employee directors, and had "sole and exclusive authority" to grant options to Section 16 officers.  (Plea Agmt. Ex. B.)  Dr. Samueli was not a member of the compensation committee.

---

[3] A "Section 16 officer" is a corporate officer governed by Section 16 of the Securities Exchange Act of 1934.  (Plea Agmt. Ex. B.)

On January 3, 2002, Dr. Samueli received an email message from Nancy Tullos, Broadcom's Vice President of Human Resources, regarding unresolved stock option granting issues. (Plea Agmt. Ex. B.) The email read:

> Just spoke with [Broadcom CEO Henry T. Nicholas]. He does NOT want to grant above market options on October 1st. He would like to find another opportunistic date, say $25.55 on 10/5 or $29.25 on 10/19. He does not see a need to get as close to the $33.68 number as I do. He is clearly not as sensitive to the employee reaction as I am and I can't really speak to the outside shareholder reaction.

(Plea Agmt. Ex. B-1 (emphasis in original).) The same day, Dr. Samueli responded to Ms. Tullos: "OK, then go with the 10/19 price." (Plea Agmt. Ex. B-1.) Several weeks later, on January 22, 2002, Ms. Tullos sent a spreadsheet listing the employees who would be granted options with the October 19, 2001 strike price as selected by Dr. Samueli. (Plea Agmt. Ex. B-2.) This list of grant recipients included Section 16 officers. (Plea Agmt. Ex. B-2.)

On May 25, 2007, Dr. Samueli appeared for a deposition before the SEC in connection with the SEC's investigation into Broadcom's stock option granting practices. (Plea Agmt. Ex. B.) During the deposition, the following exchange took place:

> Q:   Were you in any way involved in the process of grants to Section 16 officers?
>
> A:   **I was not involved in the actual granting process**, but Mr. Nicholas would make me aware of the amount of the grants that he was going to give to his direct reports, the Section 16 Officers. So, I was aware of the number, **but I wasn't involved in the process.**

(Plea Agmt. Ex. B (emphasis in original).)  During the change of plea proceeding, Dr. Samueli confirmed his understanding that the "actual granting process" included selecting the grant date for the particular options.  (Tr. 39:1-4, June 23, 2008.)  Dr. Samueli and the USAO further confirmed that no subsequent deposition testimony clarified or explained Dr. Samueli's answer in a way that would suggest his testimony was not knowingly and materially false.  (Tr. 11:12-15.)

The plea agreement contains a stipulated sentence pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C).  The stipulated sentence calls for: (1) five years probation; (2) a fine of $250,000; and (3) a special assessment of $100.  (Plea Agmt. ¶ 12.)  The parties further agreed that "for making a false statement to the SEC as charged in the Information, [Dr. Samueli] shall pay $12,000,000 to the U.S. Treasury."  (Plea Agmt. ¶ 12(a).)  This $12 million payment, along with the $250,000 fine and $100 special assessment, are to be paid at or before the date of sentencing.  (Plea Agmt. ¶ 12(b).)  Finally, the plea agreement allows Dr. Samueli to petition the Court for termination of his probation after three years.  (Plea Agmt. ¶ 12(e).)

In exchange for his guilty plea, the USAO has agreed not to prosecute Dr. Samueli for:

> the conduct that was the subject of the USAO's investigation of options-related activity at Broadcom occurring between 1998 and 2005, and any other conduct that was the subject of the USAO's investigation related to Broadcom, its officers, directors, and employees, occurring between 1998 and January 2003.[4]

(Plea Agmt. ¶ 17(b).)  Notably, the plea agreement does not require Dr. Samueli to cooperate with, testify in, or assist in any other way the USAO's criminal prosecution

---

[4] This agreement excludes prosecution for criminal tax violations, "including conspiracy to commit such violations chargeable under 18 U.S.C. § 371."  (Plea Agmt. ¶ 17(b).)

1   of other Broadcom executives related to that aforementioned investigation.  (Tr. 5:5-6

2   ("[Assistant U.S. Attorney]: There is no cooperation provision.  That is correct, Your

3   Honor.") .)

4

5   **II.    RULE 11(c)(1)(C) PLEA AGREEMENTS**

6

7          Rule 11 is the "principal provision in the Federal Rules of Criminal Procedure

8   dealing with the subject of guilty pleas and plea agreements." *United States v. Hyde*,

9   520 U.S. 670, 673-74 (1997).  The plea agreement before the Court is governed by

10  Rule 11(c)(1)(C) because the USAO has "agree[d] that a specific sentence or

11  sentencing range" should apply to Dr. Samueli.  FED. R. CRIM. P. 11(c)(1)(C); *United*

12  *States v. Ellis*, 356 F.3d 1198, 1206 n.12 (9th Cir. 2004) (en banc).  When the parties

13  reach this type of plea agreement, "the court has three options: it may accept the

14  agreement, reject it, or defer a decision until the court has reviewed the presentence

15  report." *Ellis*, 356 F.3d at 1206 (quoting FED. R. CRIM. P. 11(c)(3)(A)) (internal

16  quotations omitted).  Although the court is free to accept or reject the plea agreement,

17  it may not do so on a piecemeal basis, and the Rule 11(c)(1)(C) stipulated sentence is

18  binding upon the court's acceptance of the plea agreement. *In re Morgan*, 506 F.3d

19  705, 709 (9th Cir. 2007).  Conversely, if the court chooses to reject the plea

20  agreement, the defendant must be provided with an opportunity to withdraw his guilty

21  plea and an advisement that if the guilty plea is not withdrawn, "the court may dispose

22  of the case less favorably toward the defendant than the plea agreement

23  contemplated." FED. R. CRIM. P. 11(c)(5).

24

25         At the June 23, 2008 change of plea proceeding, the Court accepted Dr.

26  Samueli's guilty plea, (Tr. 42:3-4), and deferred acceptance of the plea agreement

27  pending preparation and review of the presentence report, (Tr. 42:5-43:11).  The Court

28

1   is therefore left to decide whether to accept the plea agreement, thus binding the Court

2   to the parties' stipulated sentence, or to reject the agreement and allow Dr. Samueli to

3   withdraw his guilty plea should he so choose.

4

5   **III.   ANALYSIS**

6

7       **A.   Standard of Review**

8

9       When presented with a Rule 11(c)(1)(C) plea agreement, "it is not only

10  permitted but expected that the court will take an active role in evaluating the

11  agreement." *United States v. Kraus*, 137 F.3d 447, 452 (7th Cir. 1998).  As the

12  district court traditionally exercises broad discretion over all aspects of criminal

13  sentencing, whether to accept or reject a plea agreement containing a stipulated

14  sentence is likewise left to the sound discretion of the court. *Morgan*, 506 F.3d at 712

15  (citing *Vasquez-Rameriz v. United States Dist. Court*, 443 F.3d 692, 699 (9th Cir.

16  2006)); *United States v. Nicholson*, 231 F.3d 445, 451 (8th Cir. 2000); *United States v.*

17  *Bean*, 564 F.2d 700, 703 (5th Cir. 1977)).  This discretion, however, is not limitless.

18  This Court understands that the principle of separation of powers requires that the

19  executive branch—the USAO in this case—retain discretion over the charging

20  decision.  As the Ninth Circuit explained in *United States v. Miller*, 722 F.2d 562, 564

21  (9th Cir. 1983):

22

23          When a prosecutor selects a charge, he has made an executive choice.
            When a judge sentences a defendant, he has made a judicial choice.
24          When a plea bargain is placed before a court, the necessary interplay
            between the charging and sentencing decisions becomes manifest.
25

26  In evaluating Dr. Samueli's plea agreement, the Court may not second-guess or

27  infringe upon the USAO's discretion in selecting the precise charges against Dr.

28

Samueli. *See id.* at 563, 565 (criticizing a district court for "categorically rejecting all one-count pleas to multiple count indictments"). But, because the USAO seeks to bind the Court to a stipulated sentence, the Court has an obligation to fulfill its traditional sentencing role by conducting a careful analysis of the proposed plea agreement and stipulated sentence.

The guiding principle in this analysis is one very familiar to the Court: the interest of justice. *See Ellis*, 356 F.3d at 1209 (affirming the rejection of a plea agreement that the district court found was not in the interest of justice given the defendant's criminal history and offense conduct); *Gov't of the Virgin Islands v. Walker*, 261 F.3d 370, 375 (3d Cir. 2001) ("A sentencing court can, of course, reject the results of a plea negotiation if it concludes that the resulting agreement is not in the best interest of justice.") In applying this standard, some courts have considered whether the sentence itself is too lenient. *Ellis*, 356 F.3d at 1209 (explaining that Rule 11 allows for the rejection of a plea agreement "when the court believes the sentence is too lenient"); *United States v. Greener*, 979 F.2d 517, 520 (7th Cir. 1992) (holding the district court did not abuse its discretion by concluding the plea "would not adequately represent the defendant's criminal conduct"); *Bean*, 564 F.2d at 704 ("A decision that a plea bargain will result in the defendant's receiving too light a sentence . . . is a sound reason for a judge's refusing to accept the agreement."). Others have looked to whether the plea agreement complies with and advances the purpose of criminal sentencing as expressed by Congress. *United States v. O'Neill*, 437 F.3d 654, 661 (7th Cir. 2006 ) (Posner, J., concurring) (observing that § 3553a sentencing factors can provide a standard for evaluating the acceptability of a plea agreement); *United States v. Torres-Echavarria*, 129 F.3d 692, 696 (2d Cir. 1997).

The Court's inquiry into whether the plea agreement is in the interest of justice must be based on an "individualized analysis of the specific facts presented by the case." *Morgan*, 506 F.3d at 711 n.3 (citing *United States v. Smith*, 417 F.3d 483, 486-87 (5th Cir. 2005); *United States v. Gamboa*, 166 F.3d 1327, 1330-31 (11th Cir. 1999); *Greener*, 979 F.2d at 519-20; *United States v. Carrigan*, 778 F.2d 1454, 1462 (10th Cir. 1985)). For example, in *United States v. Ellis*, the sixteen-year-old defendant was initially charged with first degree murder. 356 F.3d at 1201. The Government moved to try him as an adult given his prior state court conviction for residential burglary. *Id.* The parties eventually entered into a Rule 11(c)(1)(C) plea agreement whereby the defendant pleaded guilty to a single-count information charging him with second degree murder and stipulating to a sentence of 132 months in prison. *Id.* The district court rejected the plea agreement after reviewing the presentence report, which disclosed three prior juvenile adjudications and seven arrests and revealed "that the FBI had developed a somewhat solid case against [the defendant] for premeditated murder, proof of which would support a first degree murder charge." *Id.* at 1202.

On appeal, an en banc panel of the Ninth Circuit approved of the judge's evaluation of the defendant's "criminal history and the circumstances of the offense charged" as a basis for rejecting the plea. *Id.* at 1209. In evaluating the offense conduct, the district court looked beyond the factual basis supporting the plea, and the court was permitted, and arguably obligated, to probe all of the defendant's relevant offense conduct, including the initial charges levied against him. *See id.*[5] Here, the Court must consider all of Dr. Samueli's conduct as alleged by the Government in

---

[5] The en banc panel, however, disapproved of the district court's decision to reinstate the first degree murder charge because such a decision impermissibly intruded on the prosecutorial charging decision. *Id.*

order to conduct an "individualized analysis" of the facts and circumstances related to this plea agreement. *See Morgan*, 506 F.3d at 711 n.3.

### B.   The Serious Allegations Against Dr. Samueli

Dr. Samueli has pleaded guilty to a single-count information and was never formally indicted for his role in Broadcom's stock option granting practices between 1998 and 2003. However, a civil enforcement action filed by the SEC, *SEC v. Henry T. Nicholas et al.*, SACV 08-00539-CJC(RNBx) ("SEC Complaint" or "Complaint") and a criminal indictment of two former Broadcom executives, *United States v. Henry T. Nicholas et al.*, SACR 08-00139-CJC ( "Criminal Indictment" or "Indictment") indentify Dr. Samueli and describe his conduct with respect to the alleged securities fraud. In fact, the Criminal Indictment names Dr. Samueli seventy-two times. Given the existence of these allegations, the Court's evaluation of the plea agreement must include an assessment of them, as the Government presumably had a factual basis.

As a broad overview, the allegations describe a practice at Broadcom of using backdated stock options to recruit and compensate employees. Instead of taking a compensation expense for the options grants, corporate officers and employees falsified documents to create the appearance that the stock options were granted days or weeks earlier at a low-point in the closing price of the stock. This practice allowed the recipients to sell the shares at a considerable profit and relieved the company of reporting the compensation charge on its balance sheet. Over the course of five years, the total unrecorded compensation expenses totaled $2.2 billion, depriving shareholders, auditors, and the market of accurate information about Broadcom's

1  financial health and the value of its stock.  The SEC describes the scope of the scheme

2  as "the largest accounting restatement to date arising from stock options backdating,"

3  warranting "significant sanctions" against the perpetrators.[6]

4

5  By Dr. Samueli's own admission during the change of plea proceeding, he had

6  some knowledge of and participated to some degree in the alleged backdating scheme.

7  In the email exchanges proving his statement to the SEC was false, Dr. Samueli

8  selected an October 19, 2001 grant date weeks after the date had passed, on January 3,

9  2002.  (Plea Agmt. Ex. B-1 ("OK, then go with the 10/19 price.").)  An email received

10  by Dr. Samueli on January 22, 2002 listed all those individuals and officers who were

11  to receive stock options backdated to October 19, 2001.  (Plea Agmt. Ex. B-2.)  Dr.

12  Samueli was well aware of the practice of stock option backdating at Broadcom.  He

13  admitted in open court that the factual basis underlying his guilty plea was true and

14  correct.

15

16  The Government's allegations, however, offer even greater detail about the

17  depth and breadth of Dr. Samueli's involvement in the alleged backdating scheme.

18  Dr. Samueli is named as one of four conspirators in the alleged scheme to commit

19  securities fraud.  (Criminal Indictment ¶ 4 ("At all times relevant to this Indictment,

20  unindicted co-conspirator[7] H.S. was Broadcom's co-founder, Chief Technical Officer,

21  and a Section 16 Officer."), ¶ 18 (alleging that the conspirators "knowingly combined,

22

23

24

25  [6] Statement of Linda Chatman Thomsen, *supra* note 2.

26  [7] A co-conspirator is "[a] person who engaged in a criminal conspiracy with another; a fellow
   conspirator." BLACK'S LAW DICTIONARY 273 (8th ed. 2004).  An unindicted co-conspirator is "[a]
27  person who has been identified by law enforcement as a member of a conspiracy, but who has not
   been named in the follow conspirator's indictment." *Id.*
28

-11-

conspired and agreed to commit . . . securities fraud").)[8] "By fraudulently backdating and repricing option grants," the Indictment alleges, "defendants and their co-conspirators [Nicholas, Ruehle, Samueli and Tullos] deceived Broadcom's shareholders, potential shareholders, and auditors" about $2.2 billion in unreported employee compensation expenses. (Criminal Indictment ¶¶ 15d, 17.) The scope of the alleged conspiracy was extensive, resulting in "tens of millions of backdated in-the-money and repriced options." (Criminal Indictment ¶ 15c.) Because the Government has named Dr. Samueli as a co-conspirator, he could be held criminally responsible for all of the substantive offenses committed by his alleged co-conspirators, if indicted by the grand jury.[9] *United States v. Testa*, 548 F.2d 847, 855 (9th Cir. 1977) (citing *Pinkerton v. United States*, 328 U.S. 640, 647 (1946)) ("A party to a conspiracy is liable for the acts of his co-conspirators in furtherance of the conspiracy. . . .").

Dr. Samueli is also alleged to have selected the dates to which stock options would be backdated and falsified numerous corporate records to conceal and disguise the fraud. Drs. Nicholas and Samueli, as the sole members of the options committee, "in effect determined options grants for all employees, including section 16 officers." (SEC Complaint ¶ 17; Criminal Indictment ¶ 132, Overt Act 43 (alleging Dr. Samueli's participation in selecting a December 24, 2001 grant date on January 4, 2002), Overt Acts 35-38 (alleging Dr. Samueli received several emails documenting the list of recipients of backdated options).) Broadcom relied on documents called "Unanimous Written Consents" to memorialize meetings of the options committee

---

[8] (SEC Complaint ¶ 2 (alleging that the "backdating scheme was orchestrated and carried out by Broadcom's most senior executives, including . . . Henry Samueli, Broadcom's Co-Founder and [then-]current chairman and chief technical officer").)

[9] Additionally, the SEC Complaint makes direct allegations about Dr. Samueli's intent. ( SEC Complaint ¶ 90a (alleging intent to defraud), ¶ 87 (alleging Dr. Samueli knew that Broadcom submitted materially false documents to conceal the fraud).)

where stock options were granted to employees or recruits. (Criminal Indictment ¶ 132, Overt Act 2; SEC Complaint ¶ 18.) The Government alleges that Dr. Samueli, on at least seventeen distinct occasions, signed Unanimous Written Consents to reflect a meeting of the options committee that had not occurred, and which he knew had not occurred. (Criminal Indictment ¶ 132, Overt Acts 2, 4-7, 11, 14, 17, 19, 27, 48-49, 55, 58, 62-64.)[10] Instead, these falsified Unanimous Written Consents made it appear as if Broadcom's options committee had met and granted at-the-money options, which would not require the company to charge the option as a compensation expense. Thus, these falsified Unanimous Written Consents created the documentation that allowed the co-conspirators to conceal their alleged scheme from shareholders, auditors, and the public. Dr. Samueli, as a member of the options committee, was a necessary participant in the alleged securities fraud; if he had not falsified numerous Unanimous Written Consents, Broadcom could not have created the appearance that the options had not been backdated.

Dr. Samueli is also alleged to have personally advocated the use of a particular fraudulent corporate acquisition technique to recruit employees to Broadcom. (SEC Complaint ¶ 26.) Instead of granting stock options directly to certain recruits, Broadcom manufactured false employments records to create the impression that the recruit had worked for a start-up company that Broadcom intended to acquire, when in fact the recruit never had. (SEC Complaint ¶ 26.) The recruit could then purchase shares of the acquired company's stock at a price that was "enormously in-the-money" upon the completion of the acquisition. (SEC Complaint ¶ 26.) Through this practice, the conspirators were able to avoid taking a direct compensation charge by

---

[10] (SEC Complaint ¶ 3 ("Nicholas and Samueli each signed *dozens* of false options committee unanimous written consents to memorialize numerous backdated grants.") (emphasis added), ¶ 23 (alleging that "Samueli knew there was no option committee meeting or decision to grant options on the stated dates and that the terms of the grants had not been finalized on those dates").)

compensating its recruits through stock options in another company that were guaranteed to be profitable. "[Dr.] Samueli advocated this approach for several potential key employees." (SEC Complaint ¶ 26.)[11]  Like the falsified Unanimous Written Consents, this practice represents another instance in which Dr. Samueli is alleged to have created fraudulent corporate records to carry out and conceal the securities fraud at Broadcom.

The Government's allegations against Dr. Samueli are both extensive and troubling.  Dr. Samueli, of course, may have full and complete defenses to the allegations.  These allegations may not be true.  While the Court in no way presumes Dr. Samueli actually engaged in the alleged securities fraud, the Court simply cannot ignore the allegations when conducting its inquiry under Rule 11.  All potential criminal liability that is to be contractually discharged under the plea agreement must be considered.  *See Miller*, 722 F.2d at 566.  To that end, the Court is not limited to considering only the offense conduct surrounding the charge to which Dr. Samueli has pleaded guilty.  *See Ellis*, 356 F.3d at 1201 (considering the offense conduct in the initial indictment in addition to the conduct charged in the superseding information to which the defendant pleaded guilty).  Thus, any conduct that is to be disposed of by the plea agreement must be evaluated in assessing whether the agreement is in the interest of justice.

## C.    The Plea Agreement is Not in the Interest of Justice

The USAO moves the Court to accept the plea agreement as a reasonable disposition of the matter.  *See Miller*, 722 F.2d at 566 (instructing the district court to

---

[11] (*See also* Criminal Indictment ¶¶ 36, 40 (describing backdated grants to the former employees of "Altocom" and "Hot Haus," two companies acquired by Broadcom).)

"set forth, on the record . . . the prosecutor's reasons for framing the bargain as he did"). In its sentencing position, the USAO notes several material differences between Dr. Samueli and the indicted Broadcom executives, Dr. Nicholas and Mr. Ruehle. Dr. Samueli was the Chief Technical Officer ("CTO") at Broadcom. As the CTO, he was principally responsible for engineering and technical matters. By contrast, however, Dr. Nicholas and Mr. Ruehle were Broadcom's Chief Executive Officer and Chief Financial Officer, respectively, and they were "directly responsible for financial matters and the review and approval of the financial reports that were publicly filed." (USAO Sentencing Position 14.) As CTO, Dr. Samueli did not sign any public filings or have any duties related to accounting, finances, and securities regulations.[12] (USAO Sentencing Position 14.) The USAO further points out that Dr. Samueli has pleaded guilty to a distinct crime, making a false statement, whereas Dr. Nicholas and Mr. Ruehle are charged with entirely different, more serious crimes.

The USAO also offers a number of reasons why a probationary sentence is an appropriate punishment for Dr. Samueli's false statement to the SEC. First, his offense level is four, putting him in Zone A of the sentencing guidelines with a sentencing range of zero to six months, commonly resulting in a probationary sentence. See U.S.S.G. § 5B1.1. The USAO also notes that Dr. Samueli has agreed to make a $12 million payment to the U.S. Treasury, a "significant sum, which is being paid in recognition of the import and impact of [Dr. Samueli's] false testimony to the SEC . . . ." (USAO Sentencing Position 11.) The USAO further points to Dr. Samueli's personal life, including his pioneering technological activities, charitable and philanthropic works, and lack of any attempt to conceal his behavior. (USAO Sentencing Position 12.) Finally, the USAO suggests that the probationary sentence is

---

[12] The USAO overlooks the fact that Dr. Samueli was Broadcom's Co-Founder and served as the Co-Chairman of the Board of Directors during much of the relevant period.

reasonable because Dr. Samueli will face a number of collateral consequences from pleading guilty to a felony count, including the termination of his association with Broadcom, suspension of ownership of a professional hockey team, potential removal of his name from two universities' schools of engineering, and a tarnished legacy. (USAO Sentencing Position 12-13.)

After careful consideration of all the facts and circumstances presented by this plea agreement, including the offense conduct, the allegations of Dr. Samueli's role in Broadcom's alleged securities fraud, the parties' position regarding sentencing, and Dr. Samueli's criminal history and personal characteristics, the Court cannot conclude that the plea agreement, which calls for a five-year probationary sentence, is in the interest of justice. While the interest of justice is animated by many fundamental concepts, several are paramount with respect to criminal sentencing. To serve justice, the sentence must reflect the severity of the offense conduct, including all the facts and circumstances of the crime. The sentence must not create an obvious disparity between one criminal actor and other similarly situated criminal actors. And the sentence must protect the public's interest in enforcement of, and respect for, our laws and system of justice. *See generally* 18 U.S.C. § 3553(a); U.S.S.G. § 6B1.2, Commentary. For a number of reasons, this plea agreement does not satisfy those important principles.

First and foremost, the proposed five-year probationary sentence does not reflect the seriousness of Dr. Samueli's alleged misconduct. Dr. Samueli is named in the Criminal Indictment as one of four conspirators who concealed $2.2 billion in corporate compensation expenses by backdating stock options. (Criminal Indictment ¶¶ 4, 15, 17, 18.) As a result of this alleged fraud, investors and shareholders were deceived about the true financial health of Broadcom and the value of its stock. In

1   support of the plea agreement, the USAO's urges that Dr. Samueli merely occupied

2   himself with technical matters.  However, the SEC Complaint and Criminal

3   Indictment allege that Mr. Samueli falsified dozens of corporate records to further and

4   disguise the fraud, (Criminal Indictment ¶ 132, Overt Acts 2, 4-7, 11, 14, 17, 19, 27,

5   48-49, 55, 58, 62-64), selected the date to which options should be backdated, (SEC

6   Complaint ¶ 40), and advocated the creation and use of fraudulent employment

7   records to compensate recruits with backdated grants through acquired companies,

8   (SEC Complaint ¶ 26).  The Court cannot overlook the allegations about Dr.

9   Samueli's conduct with respect to the alleged backdating scheme at Broadcom.  The

10  interest of justice is not served by a sentence that is too lenient and fails to adequately

11  capture the seriousness of the offense.  *See Ellis*, 356 F.3d at 1209 (explaining that

12  Rule 11 allows for the rejection of a plea agreement "when the court believes the

13  sentence is too lenient").

14

15        The Court is not alone in concluding that a five-year probationary sentence does

16  not capture the seriousness of Dr. Samueli's alleged misconduct.  The presentence

17  report prepared by the U.S. Probation office concludes that a probationary sentence is

18  insufficient and recommends a twelve-month term of incarceration.  The presentence

19  report notes that the factual basis for Dr. Samueli's guilty plea for making a false

20  statement indicates that Dr. Samueli was aware of the backdating practices at

21  Broadcom and, in fact, participated in backdating by selecting grant dates.

22  (Presentence Report 6.)  The report describes Dr. Samueli as an "active and knowing

23  participant" in the criminal scheme, albeit with lesser culpability than Dr. Nicholas or

24  Mr. Ruehle who face criminal charges.  (Presentence Report 6.)  Given Dr. Samueli's

25  alleged involvement in the securities fraud, the probation officer recommends a six-

26  month upward variance from the high end of the advisory guideline range.  Any lesser

27  sentence, the presentence report states, "would fail to adequately reflect the

28

1   seriousness of the offense or sufficiently address the issues of just punishment and

2   adequate deterrence." (Presentence Report 7.)

3

4       The five-year probationary sentence is also contrary to the interest of justice

5   because conceivably, it is vastly disproportionate to similarly situated defendants, both

6   with respect to Dr. Samueli's co-conspirators in this securities fraud, and with respect

7   to all defendants sentenced for crimes of fraud. First, two of Dr. Samueli's alleged co-

8   conspirators face prison sentence that could last for the remainder of the natural lives,

9   340 years for Dr. Nicholas and 370 years for Mr. Ruehle.[13]  All three held senior

10  executive positions at Broadcom, Dr. Nicholas as CEO, Mr. Ruehle as CFO, and Dr.

11  Samueli as CTO. All three are named as co-conspirators in the backdating scheme

12  and were active participants in the backdating scheme. And all three are alleged to

13  have selected fraudulent grant dates and falsified corporate documents. Even

14  assuming as true that Dr. Samueli is less culpable than Dr. Nicholas and Mr. Ruehle,

15  the disparity between five years of probation and over 300 years of imprisonment is

16  inexplicable.

17

18      A similar disparity is evident with respect to Nancy Tullos, another co-

19  conspirator in the backdating scheme, who has also pleaded guilty to a lesser charge.

20  Ms. Tullos pleaded guilty to a single count of obstruction of justice for instructing a

21  human resources employee to delete an email communication related to stock options.

22  *See United States v. Tullos*, SACR 07-00274-CJC, Docket Entry 6, 11/30/07. Under

23  the plea agreement entered into by the USAO, Ms. Tullos' proposed base offense

24  level, prior to any downward departure for her cooperation, is thirteen. Dr. Samueli's

25  base offense level by comparison is four. Assuming Ms. Tullos has a criminal history

26

27  ---

    [13] *See* Statement of Thom Mrozek, United States Attorney's Office for the Central District of

28  California, June 5, 2008, at 2, *available at* www.usdoj.gov/usao/cac/pressroom/pr2008.078.html.

category of "I," the guideline sentencing range under the plea agreement calls for twelve to eighteen months in prison. Dr. Samueli, a fellow conspirator to Ms. Tullos, is only subject to five years probation despite his more senior positions—CTO, Co-Founder of the company, and Co-Chairman of the Board.[14]  Moreover, Ms. Tullos was required to cooperate with the USAO's investigation and prosecution of Dr. Nicholas and Mr. Ruehle as a condition of her plea agreement.

Similarly, the proposed five-year probationary sentence is inconsistent with the vast majority of sentences imposed upon defendants for criminal fraud.  In 2007, of the 1,512 individuals sentenced for fraud in the Ninth Circuit, over seventy percent were sentenced to prison; only fifteen percent received sentences of probation alone. U.S. Sentencing Commission, Statistical Information Packet, Fiscal Year 2007, Ninth Circuit at p. 8, Table 5, *available at* www.ussc.gov/ JUDPACK/2007/9c07.pdf.  Of those sentenced to prison in the Ninth Circuit, the average (mean) length of imprisonment was 17.1 months. *Id.* at Table 7.  Here, Dr. Samueli is alleged to have actively participated in a securities fraud disguising $2.2 billion in compensation expenses from shareholders, auditors and the SEC.  Few, if any, of the fraudulent schemes documented in the 2007 sentencing statistics could conceivably approach the magnitude of the alleged fraud at Broadcom.  A probationary sentence for the massive fraud at Broadcom is thus starkly inconsistent with the seventeen-month sentence that is typical for the average defendant guilty of fraud.

Finally, the Court does not find the plea agreement in the interest of justice because Dr. Samueli is not required to cooperate with federal authorities in their

---

[14] The Court recognizes that Ms. Tullos' plea agreement does not include a provision to pay a $12 million penalty to the U.S. Treasury.  However, the Court feels confident in presuming that no defendant would object to a $12 million payment to avoid prison if his or her net worth were anywhere near that of Dr. Samueli.

investigation and prosecution of backdating at Broadcom.  Unlike Ms. Tullos, Dr.
Samueli is not obligated under the agreement to testify or cooperate with the USAO in
the trial of Dr. Nicholas or Mr. Ruehle.  (Tr. 5:5-6.)  Undoubtedly, Dr. Samueli has
enormous information and insight into the activities of Dr. Nicholas and Mr. Ruehle
given his status and position at Broadcom.  Dr. Samueli served with Dr. Nicholas on
Broadcom's options committee, (Criminal Indictment ¶ 10), he communicated with
Dr. Nicholas and Mr. Ruehle regarding backdated options, (Criminal Indictment ¶ 93),
and he was involved in the review of public filings, (SEC Complaint ¶¶ 69, 77).  Dr.
Samueli's testimony about these events and practices would aid the USAO's
prosecution tremendously, yet he is under no obligation to testify.  In fact, his counsel
has stated in open court that he may invoke the Fifth Amendment if called to testify,
as is his right.  Approving a lenient plea agreement without any provision for
cooperation by Dr. Samueli does not promote the public's respect for the judiciary or
serve the public's interest in efficient administration of criminal justice.  For that
reason, too, this plea agreement is not in the interest of justice.

The USAO argues that Dr. Samueli's $12 million payment to the U.S. Treasury
should alleviate the Court's concern about any perceived leniency in the sentence.  Far
from alleviating the Court's concerns, however, the $12 million payment instead
exacerbates the injustice of this sentence.  The plea agreement characterizes the
payment as one made "for making a false statement to the SEC."  (Plea Agmt. ¶
12(a).)  Under § 1001, the statutory maximum fine for making a false statement to
federal authorities is $250,000.[15]  This additional monetary penalty suggests that the
USAO recognizes that a sentence of five years probation and a $250,000 fine does not
adequately capture the seriousness and extent of his alleged misconduct.  If the

---

[15] The USAO argues the $12 million payment is not part of the sentence, but is instead a separate
and distinct contractual payment.

sentence contemplated by the plea agreement were adequate, the Government would have no further need to request $12 million from Dr. Samueli. Or, if Dr. Samueli's misconduct justified a sentence more severe than five years probation and a $250,000 fine, the USAO should have recommended it.

It would erode the public's perception of our justice system to accept a plea agreement containing an unprecedented payment of $12 million to resolve the criminal liability of one of four co-conspirators in an alleged $2.2 billion securities fraud. The payment allows for a strong inference that the Government accepted this staggering sum of money in return for a recommendation that Dr. Samueli receive a probationary sentence as opposed to any term of imprisonment or confinement. The public expects justice to be administered fairly, without regard to a defendant's race, religion, ethnicity, class, or wealth. No sentence can be based on the amount of money a defendant is willing and able to pay.

Given all these facts and circumstances, the Court cannot accept this plea agreement. The probationary sentence agreed to by the parties does not capture the seriousness of Dr. Samueli's alleged conduct; it has the potential of creating huge disparities between the sentences, or potential sentences, of similarly situated defendants; it does not promote efficient administration of justice; it does not inspire public respect for our criminal justice system; and it gives the appearance that wealthy and popular defendants are given more lenient and favorable plea deals. The Court takes no pleasure in reaching this decision. Dr. Samueli's public works as an entrepreneur, technological innovator, community leader, and philanthropist are beyond reproach. Moreover, he is entitled to a presumption of innocence in this Court. However, every plea agreement containing a stipulated sentence must be fully and carefully evaluated by the Court to ensure that it serves the interest of justice.

In light of the serious securities fraud in which Dr. Samueli is alleged to be a co-conspirator, this plea agreement is not in the interest of justice, and it must therefore be rejected.


DATED:      September 8, 2008


                              CORMAC J. CARNEY
                              UNITED STATES DISTRICT JUDGE